FILED

2026 Aug-12  PM 01:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:24-cr-00443-MHH-JHE-1** |
| | ) | |
| **FLEMMINGS DURELL CHATMAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | | |

### MEMORANDUM OPINION AND ORDER

Mr. Chatman has asked the Court to hold a *Franks* hearing and to suppress evidence obtained pursuant to warrants authorizing wiretaps. (Docs. 72, 94). After conducting an evidentiary hearing on Mr. Chatman's motion, (Doc. 122; Minute Entry 1/27/26), and considering the parties' written submissions, (Docs. 72, 97, 99, 112, 128, 134), Chief Magistrate Judge England entered a report in which he recommended that the Court deny Mr. Chatman's request for a *Franks* hearing and deny Mr. Chatman's motion to suppress, (Doc. 148). Mr. Chatman has objected to Judge England's report and recommendation. (Docs. 161, 162). This opinion addresses Mr. Chatman's objections.

### I.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). A

district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider *de novo* any objection to the magistrate judge's recommendation.").  A district court's obligation to "'make a *de novo determination* of those portions of the report or specified proposed findings or recommendations to which objection is made,'" 447 U.S. at 673 (quoting 28 U.S.C. § 636(b)(1)), requires a district judge to "'give *fresh consideration* to those issues to which specific objection has been made by a party,'" 447 U.S. at 675 (quoting House Report No. 94-1609, p. 3 (1976)).  *United States v. Raddatz*, 447 U.S. 667 (1980) (emphasis in *Raddatz*).

If a party objects to a magistrate judge's factual findings, a district court may, "after thorough review and a *de novo* determination, . . . credit the magistrate judge's findings."  *See United States v. Watkins*, 760 F.3d 1271, 1284 (11th Cir. 2014); *see Raddatz*, 447 U.S. at 674 (explaining that a district court has the duty to make "a *de novo* determination, not [to hold] a *de novo* hearing").[1]

---

[1] "A district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings." *United States v. Cofield*, 272 F.3d 1303, 1305 (11th Cir. 2001) (citing *United States v. Raddatz*, 447 U.S. 667, 675–76 (1980)).  But "a district court must rehear the disputed testimony before rejecting a magistrate judge's credibility determinations." *Cofield*, 272 F.3d at 1306.  Thus, ordinarily, a district court should conduct an evidentiary hearing when a party objects to a magistrate judge's credibility findings.  Mr. Chatman does not object to Magistrate Judge England's credibility findings. (*See* July 21, 2026 hearing transcript, available upon request).

## II.

After considering Mr. Chatman's factual objections and the record in this case, including the transcript of the January 27, 2026 evidentiary hearing, the Court credits Magistrate Judge England's factual findings. [2] The facts of this matter are as follows:

### 1. First Wiretap Affidavit

On July 22, 2024, DEA Special Agent Daniel G. Haynes submitted an affidavit in support of a warrant application for two target telephones: Telephone 1 ("TT1," Chatman's phone) and Telephone 2 ("TT2," alleged co-conspirator Kenneth Honneycutt's phone). At the time, Chatman was serving a 36-month term of federal supervised release following 48 months of federal incarceration on charges of use of a communication device to facilitate drug trafficking and felon in possession of a firearm.

The affidavit begins by disclosing Agent Haynes' training and experience derived from work with the DEA since April 2023, plus prior work as a defense contractor and with the US Army Special Forces. (Def. Exh. 2 at 1–5). Included in this section is a description of Agent Haynes' training concerning drug investigations: that drug traffickers generally conceal their transactions behind "seemingly innocent terms," that they frequently use cellphones, and the like. (*Id.*).

The second portion of the affidavit concerns the nature of the investigation and the request for a wiretap. (*Id.* at 5–11). In this section, Agent Haynes describes how he knows the phone numbers to be

---

[2] Several of Mr. Chatman's factual objections seem to challenge the interpretation of undisputed facts. For instance, Mr. Chatman objects to the description of 514 Lawrence Street as a "stash house" and argues that Mr. Chatman was not the source of supply for the transactions described in the affidavits. (Doc. 162, p. 13). These arguments do not raise the kind of witness credibility issues that would warrant a *de novo* evidentiary hearing but instead concern inferences that the jury may choose to draw from the evidence at trial.

associated with Chatman and Honneycutt. (*Id.* at 5–7). Based on his investigation, Agent Haynes states that TT1 and TT2 are believed to be involved in drug trafficking offenses and that target subjects Chatman, Honneycutt, Brian Whatley, Ladarious Brown, Elijah Brown, Jacquantis Noland-Turner, and Keandre Thomas are likely to be committing those offenses. (*Id.* at 7–9). Agent Haynes also states that probable cause exists that information concerning those offenses will be obtained through wiretapping TT1 and TT2: the nature, extent, and methods of the trafficking operations, the identity of sources of supply ("SOS"), the identities of customers and co-conspirators, and the like. (*Id.* at 10–11). Agent Haynes states that "[n]ormal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ, as described herein in further detail." (*Id.* at 10). And Agent Haynes recounts the basis for his knowledge of the facts in the affidavit. (*Id.* at 10–11).

The next section of the affidavit provides information concerning the targets of the investigation. (*Id.* at 12–27). This includes biographical and demographic information as well as the targets' criminal histories. (*Id.*). In this section, Agent Haynes discloses that Whatley and Chatman are believed to run separate drug trafficking organizations ("DTO") in Talladega but have "a positive working relationship with each other." (*Id.* at 16–17).

Next, the affidavit provides Agent Haynes' sources of information concerning what Agent Haynes terms the "Honneycutt DTO" and the "Chatman DTO." (*Id.* at 27–35). This includes two confidential sources, CS-1 and CS-2. The affidavit details CS-1's (extensive) criminal history and the circumstances under which CS-1 was enlisted into the investigation in August 2023. (*Id.* At 28–32). CS-1 provided information about the scope of the alleged drug trafficking organization and was utilized for more than 15 controlled purchases on behalf of the West Alabama Narcotics Task Force ("WANTF") and for two controlled purchases on behalf of the DEA. (*Id.* at 31). The affidavit discloses that CS-1 was motivated initially by "judicial consideration to avoid a revocation of probation" and has since been financially compensated. (*Id.* at 31–32). As for CS-2, the affidavit describes CS-2 as a confidential source since May 2024 and again details a lengthy criminal history. (*Id.* at 32–35). CS-2 completed a controlled purchase

on behalf of the Jasper Police Department, obtaining 16 ounces of methamphetamine from Whatley through a call placed to Chatman at TT1. (*Id.* at 33–34). For investigatory purposes, Agent Haynes stated that this established a connection between Whatley and Chatman. (*Id.* at 34–35).

### a. Probable Cause

From there, the affidavit details the probable cause underlying the warrant application. (*Id.* at 35–73). This includes:

**i.     February 21, 2024 Controlled Buy (Def. Exh. 2 at 37–41)**
Agents set up a controlled buy to take place on February 21, 2024. During this controlled buy, CS-1 picked up Elijah Brown in Tuscaloosa, ultimately waiting about an hour and a half for him to arrive. CS-1 and Elijah Brown pulled into a Taco Bell parking lot in Bessemer. Elijah Brown placed a call to an unknown SOS. Toll results showed that Elijah Brown had been in communication with TT2 while brokering the transaction; ACCURINT inquiries revealed that Honneycutt was the user of TT2, and CashApp records showed that Honneycutt was the user identified as "kingcutt." Agents observed a black 2015 Chrysler 200 pulling into the Circle K next to the Taco Bell. Honneycutt exited the Chrysler, using TT2 as he walked towards the Circle K entrance. Ultimately, a transaction took place in the Circle K parking lot in which CS-1 exchanged $1,200 in official advanced funds for eight ounces of methamphetamine.

Following this transaction, Tuscaloosa County District Court Judge Joanne Jannik authorized geolocation tracking on TT2 for a period of 30 days.

**ii. February 28, 2024 Controlled Buy (*Id.* at 41–45)**
During this controlled buy, CS-1 again bought eight ounces of methamphetamine from Honneycutt, again for $1,200 and again brokered through Elijah Brown. This transaction took place in a Birmingham Shell gas station parking lot. CS-1 followed Elijah Brown's Chevrolet Equinox to the Shell station. Eventually, a red Nissan Rogue arrived. Honneycutt exited the Rogue and entered the Equinox. Elijah Brown motioned for CS-1 to walk over to the Equinox.

5

CS-1 handed an individual in the rear passenger seat $1,200, and the individual handed CS-1 eight ounces of methamphetamine. When debriefed at the Tuscaloosa Police Department, CS-1 was presented a photo lineup and identified Honneycutt as the person who sold him the methamphetamine.

Leading up to this purchase, TT2 had called TT1 (Chatman). A chart depicts numerous calls between TT2 and TT1, with geolocation demonstrating that Honneycutt communicated with Chatman during Honneycutt's drive from Bessemer to Pell City, where Honneycutt stopped in the vicinity of a Walmart known to agents working in Pell City to be "a common place for narcotics transactions to take place." Agent Haynes stated that "[b]ased off of pattern analysis, vehicle tracker data, pen trap and trace data, and video surveillance footage," he believed that Chatman and Honneycutt met in the Pell City Walmart parking lot to conduct a narcotics transaction prior to the controlled buy in Birmingham.[3]

### iii. April 5, 2024 Vehicle Surveillance (*Id.* at 46–50)

Following the February 2024 controlled buys, on March 20, 2024, United States Magistrate Judge Nicholas A. Danella authorized the installation and monitoring of a tracking device for both the Chrysler 200 used in the February 21 transaction and the Nissan Rogue used in the February 28 transaction. Agents began to monitor the vehicles on March 22, 2024. On April 5, 2024, agents monitored the Chrysler 200 as it traveled southbound on I-20/59 from Bessemer to mile marker 86. There, the Chrysler exited and traveled to a Huddle House in Brookwood. After some time, a black BMW with South Carolina plates parked next to the Chrysler. Honneycutt exited the Chrysler and entered the BMW's front passenger seat. Honneycutt then retrieved an item from the Chrysler's trunk and handed the object to the BMW's

---

[3] Mr. Chatman argues that Agent Haynes recklessly or intentionally omitted from his affidavit "the fact that Kenneth Honneycutt and Flemming Chatman were coworkers . . . and it was not uncommon for them to speak multiple times a day." (Doc. 162, p. 115). This omission was not material because, in addition to the reasons Magistrate Judge England articulated, the affidavit discusses communications between Mr. Chatman and Mr. Honneycutt that were close in time to drug sales. Thus, even considering Mr. Chatman and Mr. Honneycutt's work relationship, the timing of their calls raises a reasonable inference that they were communicating about drug activity.

driver, after which the BMW drove away.  Honneycutt then drove across the parking lot and handed an object to a white female in a light-colored van, after which he departed in the Chrysler.

Further investigation showed that the BMW was owned by Thomas, whom agents knew to be a distributor of drugs based on a separate investigation.  Agent Haynes stated that he believed that this was a narcotics purchase based on observations of the previous gas station purchases: "Narcotics dealers often use gas stations near interstates because it allows them easy access to high-speed avenues of entry and exit out of the area, as well as blend in with the general public. Additionally, narcotics dealers will typically conduct narcotics transactions from inside of a vehicle.  In doing so, it allows them to conceal their activities from onlookers and law enforcement."

The affidavit details a series of calls between TT2 and Thomas, which Agent Haynes believed to be facilitating a narcotics transaction.

**iv. April 9, 2024 Vehicle Surveillance (*Id.* at 50–54).**
On April 9, 2024 agents again conducted vehicle tracker data observation and video surveillance on the Chrysler 200. The Chrysler traveled to the Walmart in Pell City, where it remained stationary for about three minutes.  It then traveled to Birmingham. Agents traveled to the Walmart to obtain security footage, which revealed that a sedan pulled next to the Chrysler shortly after it arrived.  An individual exited the Chrysler, got into the sedan, exited the sedan, after which the sedan left the parking lot.  The individual returned to the Chrysler and then left the parking lot.  Agents used license plate readers to determine that the sedan was a gray Honda Accord with the tag 11ABN05, registered to the Sunny King Honda Rental Department in Anniston. Agents conducting a separate arrest warrant on April 12, 2024, observed Chatman enter and exit the residence at 514 Lawrence Street in Talladega and "utilize" a gray Honda Accord with the same license plate number.

Pen trap and trace data confirmed a series of phone calls between TT1 and TT2 during this time.  Agent Haynes concluded that this event constituted a narcotics transaction between Honneycutt and Chatman

and that the event was consistent with the detour to Pell City during the February 28 controlled buy.

### v. April 19, 2024 Vehicle Surveillance (*Id.* at 54–59)

Agents monitored the Chrysler 200 again on April 19, 2024. On that date, the Chrysler traveled from Bessemer to Talladega, where it stopped in the vicinity of 514 Lawrence Street, an address Agent Haynes stated was known to be operated by Chatman and known as a stash house for narcotics.  The Chrysler remained at the house for about two hours before leaving and traveling towards Tuscaloosa.   The Chrysler then parked at a Petro gas station in McCalla for about twelve minutes before returning to Bessemer.

A review of security camera footage by agents on April 23, 2024, showed that Honneycutt parked, exited the Chrysler, and walked into a bathroom.  A black BMW pulled alongside the Chrysler, after which Honneycutt gestured to the individual inside the BMW and returned to the bathroom.  A black male, later determined by law enforcement to be Noland-Turner, exited the BMW and walked to the bathroom, after which Honneycutt and Noland-Turner exited the bathroom together. After another set of hand gestures between Honneycutt and Noland-Turner, Honneycutt walked up to a gray sedan containing an unknown black male.  Honneycutt handed the unknown black male an unknown object before returning to the Chrysler and departing the gas station. Agent Haynes believed this to be a narcotics transaction based on the pattern of conduct (stopping at known stash house, traveling to a gas station, meeting someone in the bathroom, etc.).  The same day, TT2 communicated with a phone known to belong to Noland-Turner.

### vi. May 9, 2024 Controlled Buy (*Id.* at 59–64)

Through CS-2, agents conducting an investigation out of Jasper conducted a controlled purchase from Whatley on May 9, 2024. CS-2 provided Jasper Police Department officers with Whatley's phone number.  An analysis of phone records showed that TT1 (Chatman's phone) had communicated with Whatley's phone number over 130 times since January 2024.  CS-2 called Whatley to confirm the meet location, which ended up being a Jack's restaurant in Talladega.  Agents provided CS-2 with $2,000 in controlled funds to make the purchase (for 16 ounces of methamphetamine).  CS-2 met with Whatley, who

instructed CS-2 to follow him in his vehicle to an undetermined location.  That ended up being Whatley's house. CS-2 and Whatley exited their vehicles, entered the house, and returned about four minutes later.  CS-2 then followed Whatley again to 514 Lawrence Street.  The recording equipment provided to CS-2 captured CS-2 stating during this time period that they were en route to pick up narcotics.

At 514 Lawrence Street, both CS-2 and Whatley exited their vehicles and stood outside the residence for a short time, after which aerial surveillance observed a gray Honda Accord with an unknown driver pull up to the residence.  Agent Haynes reviewed the aerial surveillance and determined that the Honda Accord "appears to be the same 2024 grey Honda Accord that CHATMAN drives."  Whatley approached the Accord and returned to CS-2 with approximately 16 ounces of methamphetamine.  When CS-2 returned to the law enforcement agents conducting the investigation, agents showed him a photo of the Accord; CS-2 stated that the gray sedan present during the controlled buy "strongly resembled the photo."

Analysis of TT1 records showed that Chatman and Whatley communicated four times prior to CS-2 and Whatley arriving at the Lawrence Street address.  Based on this, Agent Haynes believed that Chatman used TT1 to arrange the transaction.

### vii. May 22, 2024 Surveillance of Honneycutt and Thomas (*Id*. at 64–67)

On May 22, 2024, agents again monitored the Chrysler 200's vehicle tracker data.  The data revealed that the Chrysler traveled from Bessemer to the Jack's restaurant in McCalla, arriving at about 2:36 p.m. DEA and WANTF agents visually surveilled the vehicle beginning at about 2:55 p.m., at which point the Chrysler was still parked at Jack's. At 3:05 p.m., the Chrysler departed the Jack's and traveled to an adjacent Shell station.  The black BMW owned by Thomas (observed during the April 5 transaction) pulled next to the Chrysler.  Honeycutt exited his vehicle, entered the BMW, and emerged to retrieve an unknown object from the Chrysler.  He then returned to the BMW and walked inside the Shell station. Thomas departed, and agents broke off observation of Honeycutt to follow Thomas to an address in Tuscaloosa.  Thomas remained at that address

for a brief period of time before returning to his vehicle. Agent Haynes characterized this as a suspected narcotics transaction based in part on its similarity to the April 5 transaction.

**viii. Toll and Pen Register Analysis of TT1 and TT2 (*Id.* at 67–73)**
Agent Haynes also detailed his knowledge concerning the two target phones. The financially liable party for TT1 was revealed through an administrative subpoena issued to AT&T to be Shandreka Shears, who had "been identified as a paramour of CHATMAN." On April 4, 2024, United States Magistrate Judge Gray M. Borden authorized DEA agents to install and monitor pen register and trap and trace devices on TT1. The pen register was installed on April 9, 2024. Analysis of some of the numbers revealed, from January 2, 2024 through July 17, 2024, 419 calls between TT1 and Whatley (described as "a suspected co-conspirator with CHATMAN, as well as a source of supply for illegal controlled substances in the Talladega, AL metro area") and 110 calls between TT1 and Ladarious Brown (described as "a potential source of supply/broker for CHATMAN . . . [who] per conversations with Homeland Security Investigators . . . is currently dealing with narcotics in the El Paso, TX metro area, and is currently in contact with a Mexican based cartel").

Judge Danella authorized pen register and trap and trace devices for TT2 on March 19, 2024. The devices revealed 132 calls between TT2 and Elijah Brown ("a broker/street level narcotics dealer in Tuscaloosa, AL"), 118 calls between TT2 and Thomas ("a local street dealer of illegal controlled substances in the Tuscaloosa, AL metro area"), and 38 calls between TT2 and Noland-Turner ("a local street dealer of illegal controlled substances in the Tuscaloosa, AL metro area").

**b. Necessity**
The affidavit spends approximately 25 pages asserting that the wiretap is necessary. (*Id.* at 74–100). Specifically, the affidavit contends that the wiretap will aid the government in:

> a. discovering the full scope and identification of key personnel involved in the illegal drug trafficking on behalf of UM37104 and the DTO;

b. discovering the identities and roles of all suppliers of ice-methamphetamine, and/or other drugs or controlled substances to the identified conspirators;

c. discovering the identity of the main customers of HONNEYCUTT and CHATMAN, and others yet unknown;

d. discovering the stash locations where ice-methamphetamine, and/or other drugs are stored prior to distribution;

e. discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and

f. Obtaining admissible evidence that demonstrates beyond a reasonable doubt that CHATMAN, HONNEYCUTT and the other TARGET SUBJECTS and any later identified targets, committed the alleged violations of law set forth herein.

(*Id.* at 74–75).

The affidavit also indicates that "normal investigative techniques have been tried and have failed to fully achieve the goals and objectives of this investigation, or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried." (*Id.* at 75–76).   Specifically, this includes:

### i. Confidential Sources (*Id.* at 76–78)

The affidavit states that agents were able to utilize the two CSs discussed above. During the two controlled buys in February 2024, Honneycutt told CS-1 that he did not feel comfortable dealing with anyone other than (Elijah) Brown.  As for CS-2, CS-2 could not identify Chatman as the person who provided the methamphetamine to Whatley during the May 9, 2024 controlled buy.  Agent Haynes described the use of confidential sources as "severely limited due to compartmentalization" within the DTOs, and that the use of CSs alone "has little likelihood of identifying the full scope of the organization, its members and methods" without interception.

### ii. Controlled Purchases (*Id.* at 78–80)

The affidavit indicates that despite the success of the two controlled buys, further controlled buys "would only continue to confirm that HONNEYCUTT and WHATLEY obtains [sic] distributable amounts of methamphetamine from CHATMAN when not in possession of the

11

entire amount of narcotics requested by CS-2 rather than providing any insight as to the narcotics distribution network of CHATMAN, or identify the source(s) of supply utilized by CHATMAN." Additionally, the risk of counter-surveillance measures could result in individuals alerting Honneycutt, Whatley, and Chatman to law enforcement presence, thus compromising the investigation.

### iii. Physical Surveillance (*Id.* at 80–83)

The affidavit asserts that "Surveillance, in and of itself, even if highly successful, rarely succeeds in gathering evidence of the criminal activities under investigation. It is an investigative technique that is used to confirm meetings and other suspected criminal activity between alleged participants, but often leaves investigators with insufficient evidence to prove the purpose of the meetings and other activity." The affidavit also points out several times that physical surveillance was inadequate:

> • difficulty locating Honneycutt's vehicle as he departed the controlled buy on February 21, 2024;
>
> • counter-surveillance measures employed by Honneycutt during the February 28, 2024 buy, such as Honneycutt "driving into high crime housing areas and parking where he could visually see the entrance to the housing area," ultimately resulting in officers terminating surveillance to avoid compromise;
>
> • inadequate aerial surveillance during the May 9, 2024 controlled buy due to the location of the Lawrence Street house (at a dead end, surrounded by houses whose occupants are sympathetic to Chatman) and weather conditions that caused agents to terminate the surveillance early;

Agent Haynes states that continued physical surveillance would be more effective with wire interception.

### iv. Undercover Law Enforcement Officers (*Id.* at 84–85)

Agent Haynes states that to date, agents have been unsuccessful in introducing an undercover agent into the DTOs. CS-1 is unable to do so because he has to go through Brown; CS-2 is unable to do so because he has only been able to deal with Whatley one time. Agent Haynes indicates that the compartmentalization used by DTOs would result in an undercover agent "likely hav[ing] access only to those organization

members directly involved in a particular drug delivery or sale, and not the supplier of the drugs" and that it would take a lengthy period of time to gain the trust of the targets. Additionally, any interdictions after introducing an undercover agent would likely result in suspicion of the newcomer.

### v. Search Warrants (*Id.* at 85–87)

Agent Haynes discloses that search warrants have not been used in this investigation because they would tip off the targets, potentially bringing the investigation to "an unsuccessful and premature conclusion." Additionally, agents do not know the locations of the places where the DTOs keep large quantities of drugs beyond the stash house associated with Chatman. Further, evidence seized through search warrants would "only implicate the individual directly associated with it, and not the entire organization."

As for obtaining a warrant for communications, "using subpoenas or warrants to compel the service provider to obtain stored copies of previously sent or received electronic communications is not an adequate substitute for real-time interception" due to delays in obtaining those communications.

### vi. Interviews, Grand Jury Subpoenas, and Immunity (*Id.* at 88–89).

The affidavit dismisses interviews because "based on [Agent Haynes'] training and experience, interviews of the TARGET SUBJECTS or their criminal associates are unlikely to provide sufficient information as to the identities of all the co-conspirators, the identification of the sources of supply, the location or locations where drug and drug proceeds, and other pertinent information regarding the offenses noted earlier" due to the possibility of alerting the targets, the tendency of drug traffickers to protect themselves without direct evidence of criminal wrongdoing, and the like.

Grand jury subpoenas are also likely not to yield information because subjects would invoke their Fifth Amendment rights, immunity would potentially "foreclose prosecution of the most culpable people," and the individuals under investigation would likely lie under oath unless confronted with facts supporting their culpability. Agent Haynes

indicates that he is unaware of anyone who would be helpful in a grand jury investigation by providing significant and truthful evidence.

### vii. Trash Searches (*Id.* at 89–91).

The affidavit rejects trash searches because (1) nothing of evidentiary value would likely be found at Honneycutt's residence given his practice of picking up drugs from Chatman; (2) the same concerns impeding physical surveillance of the Lawrence Street house present a high risk of compromising the investigation if a trash search were conducted there; and (3) trash searches would not be helpful in identifying the members of the conspiracy.

### viii. Other Surveillance Techniques (*Id.* at 91–95).

• Pole Camera: Agent Haynes discloses that a pole camera was installed near the Lawrence Street address, but that a wiretap would shed light on the context for transactions taking place there.

• Security Camera Footage: Security camera footage from third parties only provide "after the fact corroboration of narcotics deals that have already taken place" rather than real time interception, and in any case the usefulness of the footage is limited due to the technical aspects and location of the cameras.  Specifically, there are no cameras in bathrooms where transactions often take place.

• GPS: GPS is not entirely accurate, which makes it difficult for agents to locate targets without a secondary source of information. Agent Haynes indicates that he will seek geolocation data on both TT1 and TT2 if the wiretap is authorized because it will provide context for conversations.

• Vehicle Tracker: The vehicle tracker was helpful, but its purposes are limited to being a long-range surveillance tool that does not reflect who targets met with or the nature of the meeting.  Additionally, installing more mobile trackers would potentially compromise the investigation if officers were detected during the installation process.

### ix. Pen Registers, Trap and Trace Devices, Toll Analysis, and Subscriber Information (*Id.* at 95–96)

14

The affidavit states that these are useful, but like other techniques will not provide context for the conversations that are being monitored. Further, drug traffickers often subscribe in the name of family members or other associates to avoid detection.

### x. Mail Cover Request (*Id.* at 96–97)
Agent Haynes states that there is no indication that Chatman or Honneycutt is using the mail to conduct drug trafficking, and in any case a mail carrier might (unwittingly or otherwise) compromise the investigation by alerting Chatman or Honneycutt that they were being watched or investigated.

### xi. Other Wiretaps (*Id.* at 97–98)
The affidavit states that no wiretaps currently are in place.

### xii. Financial Investigation (*Id.* at 99–100)
The affidavit states that a financial investigation had been initiated, but no actionable information had yet resulted from it.  Agent Haynes highlights the "slow, deliberate, and labor intensive" nature of a financial investigation.  Additionally, a financial investigation would not reveal the leaders of the DTOs, delivery mechanisms for the DTOs, or how the proceeds from drug sales are hidden.  A wiretap would provide context for any money-laundering activities.

### c. Issuance
On July 22, 2024, United States District Judge R. David Proctor issued the first wiretap order, finding probable cause to support that the targets were committing drug offenses and that normal investigative procedures were inadequate (because they had been tried and failed, have little reasonable likelihood of success, or are too dangerous) and authorizing interception for 30 days following the beginning of interception.  (Def. Exh. 3).

## 2.  Second Wiretap Affidavit

After the first interception period, Agent Haynes presented an affidavit in support of a second application on September 12, 2024, to Judge Proctor for a second 30-day interception period.  (Def. Exh. 5). This application sought only to wiretap TT1 (and not TT2).  (Def. Exh. 5 (Pt.

1) at 6–11).  It also omitted some target subjects from the first application and added others, resulting in the following list of target subjects: Chatman, Honneycutt, Whatley, Ladarious Brown, Houston, an unknown male referred to as "UM 8637," a second unknown male referred to as "ATL," and a third unknown male referred to as "K-DOG."  (Def. Exh. 5 at 8, 11–24).

**a. Additional Probable Cause**
In addition to the information contained in the first affidavit, the new affidavit disclosed some new information derived from conversations captured by the first wiretap. A synopsis of those conversations is below.

**i. July 26, 2024 Phone Call (0371) Between Chatman and Whatley, 1:07 p.m. (Def. Exh. 5 (Pt. 1) at 48–51)**
In this phone call, Chatman discussed (inter alia) "that cut that Jarell and them had for that Clear," with Whatley responding that he "got some . . . however much you need."  Agent Haynes stated that based on his training, experience, and knowledge of the case, "clear" is a term used to represent methamphetamine.  He believed that this call was an attempt by Chatman to inquire whether Whatley had methamphetamine.  The remainder of the phone call represented an arrangement for Chatman to shop for a good deal on narcotics from an individual in Atlanta.

**ii. July 26, 2024 Phone Call (0417) Between Chatman and Whatley, 7:08 p.m.  (*Id.* at 51–55)**
Through his training and experience, Agent Haynes interpreted this phone call as indicating that Chatman had low quantities of narcotics and that his associates were not in a position to contact the supplier directly due to low quantities.  Whatley identified Chatman as "the plug" (a term indicating a source of narcotics) to which Chatman replied "I know right?"

**iii. July 26, 2024 Phone Call (0445) Between Chatman and UM8637, 9:47 p.m. (*Id.* at 55; Def. Exh. 5 (Pt. 2) at 1–4)**
Agent Haynes believed that the recipient of this call was in the custody of FCI Talladega based on a previous intercepted conversation. The call discussed "flakka," which Agent Haynes noted is a drug similar to bath

salts.  The previous conversation between Chatman and this recipient concerned correctional officers at FCI Talladega who were willing to smuggle flakka into the prison.  In this conversation Chatman and the recipient discussed smuggling drugs into the prison via documents soaked in those substances, purporting to be legal mail to avoid a search.

### iv. July 31, 2024 Phone Call (0890) Between Chatman and "ATL," 12:15 p.m. (Def. Exh. 5 (Pt. 2) at 4–6)

Agent Haynes stated that, based on his training and experience, this conversation involved coordination between Chatman and a person he referred to as "ATL" (believed to be a narcotics associate) to ensure that ATL's car was "clean" (i.e., with an up-to-date license and registration) for an upcoming narcotics transaction. Prior interceptions had indicated that Chatman and ATL were in the process of coordinating such a transaction.

### v. July 31, 2024 Communications (0912) Between Chatman and "K-Dog," 1:13 p.m., and Subsequent Investigation (*Id.* at 6–10)

In this conversation, Chatman and "K-Dog" discussed obtaining a clean car for an upcoming narcotics transaction in Atlanta.  Accompanying this, agents used geolocation to track TT1 traveling on the same day from Talladega to Atlanta.  DEA's Atlanta office physically surveilled Chatman and observed him following in tandem a car driven by a person later identified as Robert Houston.  Further communications intercepted on TT1 indicated that the source of supply wanted Chatman to come back the next day to pick up drugs.  Agents later learned that Houston had been pulled over by the Oxford Police Department (without the DEA's knowledge) due to a switch tag on the vehicle; Houston was driving a black Lexus registered to Chatman, but the tag was registered to a Chrysler.  An intercepted communication between Houston and Chatman indicated that Houston knew that they were supposed to have narcotics on the way back from Atlanta ("if I'd have that shit on me, what you would've did then?")

### vi. August 15, 2024 Communications (2678) Between Chatman and "ATL," 4:19 p.m. (*Id.* at 10–12)

This consisted of a brief phone conversation between Chatman and ATL, followed by a series of text messages. ATL informed Chatman

that several people wanted "zips"—ounces of illegal drugs.   The communication indicated that, rather than Chatman dropping off drugs at ATL's location, ATL should come to Chatman to get the drugs.

### 3. Necessity (*Id.* at 19–46).

The necessity information in this affidavit is very similar to that in the previous warrant.  The only apparent material addition involves contact between DEA officials and Honneycutt on September 3, 2024, intending to set up an interview for the next day. (Def. Exh. 5 (Pt. 2) at 30–31).  This meeting was a failure; Honneycutt did not show, and Agent Haynes believed that Honneycutt may have alerted Chatman that he was approached by law enforcement through an approximately 4-minute-long phone call to Chatman at 11:32 p.m. on September 3, 2024.

### 4. Issuance

Judge Proctor authorized the wiretap the same day it was requested. (Def. Exh. 6).  Surveillance began on September 16, 2024.

(Doc. 148, pp. 2 – 19).

### III.

Magistrate Judge England found that Mr. Chatman is not entitled to a *Franks* hearing because Mr. Chatman has not met his burden of demonstrating that the affidavits contain materially false statements or omissions or that the affiant, Agent Haynes, deliberately or recklessly included false statements or omissions.  (Doc. 148, pp. 20–32).  Mr. Chatman objects to Magistrate Judge England's conclusion that he is not entitled to a *Franks* hearing, (*see* Doc. 162, pp. 15, 134), but does not explain why Judge England's recommendation is incorrect.  After reviewing the record, the Court has not identified error in Magistrate Judge England's *Franks*

analysis.   Therefore, the Court overrules Mr. Chatman's objection and adopts Magistrate Judge England's thorough analysis on this point.  (Doc. 148, pp. 23–32).

Magistrate Judge England also recommended that the Court deny Mr. Chatman's suppression motion because the wiretap warrants are supported by probable cause and necessity.  (Doc. 148, pp. 33–47).  Mr. Chatman objects to this finding.  (*See* Doc. 162, pp. 107–133).  After considering the record in this case, the Court overrules Mr. Chatman's objections regarding probable cause and necessity and adopts Magistrate Judge England's analysis of these issues.

Finally, Magistrate Judge England found that, even if the affidavit was deficient, the Court should not exclude the evidence obtained during the search because officers executed the warrant in good faith reliance on its validity.  (Doc. 148, pp. 47–50).  Mr. Chatman objects to this finding and argues that the good faith exception does not apply to warrants obtained pursuant to the Wiretap Act.  (Doc. 162, pp. 16–107).

Eleventh Circuit precedent "bars suppression of evidence obtained in good-faith reliance on a court approved wiretap."  *United States v. Caldwell*, 81 F.4th 1160, 1180 (11th Cir. 2023) (affirming denial of a suppression motion "on the alternative ground" that the good faith exception applies to wiretaps).  Although Mr. Chatman argues that the Court should disregard the Eleventh Circuit's application of the good-faith exception to wiretaps because the Circuit applied "flawed"

19

reasoning, (Doc. 162, pp. 57–66), the Court is bound by this precedent. *See United States v. Lebarron*, 178 F.4th 646, 658 (11th Cir. 2026) ("[T]he first panel to address an issue is the law of this Circuit . . . unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court.") (quoting *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001)).[4]

Thus, as Magistrate Judge England explained, even if the warrant were not supported by probable cause and necessity, evidence obtained pursuant to the warrant still would be admissible under the good-faith exception. Accordingly, the Court overrules Mr. Chatman's objection and adopts Magistrate Judge England's good-faith analysis.

## IV.

For the reasons discussed above, the Court overrules Mr. Chatman's objections, adopts Chief Magistrate Judge England's report, and accepts his

---

[4] Mr. Chatman asserts that "The Supreme Court recently reaffirmed that courts cannot add exceptions to § 2515's suppression remedy in *Grayson v. United States*." (Doc. 187, p. 15). The Supreme Court's decision in *Grayson* reads in full:

> The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Sixth Circuit for further consideration in light of the position asserted by the Solicitor General in his brief for the United States filed on May 12, 2026.

*Grayson v. United States*, 146 S. Ct. 1872 (2026). The lower court's opinion did not concern the *Leon* good faith exception. *See United States v. Grayson*, No. 24-5988, 2025 WL 2366262, at *5 (6th Cir. Aug. 14, 2025). Thus, *Grayson* does not "undermine[]" *Caldwell* "to the point of abrogation." *United States v. Duldulao*, 87 F.4th 1239, 1253 (11th Cir. 2023).

recommendation.  The Court denies Mr. Chatman's motion for a *Franks* hearing and his motion to suppress.  (Docs. 72, 97).  The Clerk of Court shall please TERM Docs. 72, 97, and 148.

**DONE** and **ORDERED** this August 7, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE